UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. 2:24-cr-01223-DWL-1 |
| Plaintiff, | ) | 2:24-mj-05215-DMF |
| | ) | |
| vs. | ) | |
| | ) | |
| **Jacob Shiner,** | ) | Phoenix, Arizona |
| | ) | July 10, 2024 |
| Defendant. | ) | 10:25 a.m. |
| | ) | |

**BEFORE:   THE HONORABLE ALISON S. BACHUS, MAGISTRATE JUDGE**

**TRANSCRIPT OF PROCEEDINGS**

**DETENTION HEARING AND STATUS HEARING RE: PRELIMINARY HEARING**


**APPEARANCES:**
For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Ms. Addison B. Owen, Esq.**
    40 North Central Avenue, Suite 1800
    Phoenix, Arizona  85004-4408

For the Defendant:
    LAW OFFICES OF MICHAEL ZIEMBA
    By:  **Mr. Michael Richard Ziemba, Esq.**
    P.O. Box 71, Higley
    Arizona, 85236-0071  [!ZIP2]

Transcriptionist:
**Cathy J. Taylor**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**P R O C E E D I N G S**

THE COURTROOM CLERK: Case Number 24-5215-MJ, United States of America vs. Jacob Shiner, set before the Court for detention hearing and status hearing regarding preliminary hearing.

MS. OWEN: Good morning, Your Honor. Addison Owen on behalf of the United States.

THE COURT: Thank you. Welcome.

MR. ZIEMBA: Good morning, Your Honor. Michael Ziemba representing the defendant, Jacob Shiner, who's present, seated at defense counsel's table.

THE COURT: All right. Thank you. Welcome to you both.

So this is the time set for a detention hearing and a status hearing on the preliminary hearing.

Mr. Ziemba, how does Mr. Shiner wish to proceed today?

MR. ZIEMBA: Thank you, Your Honor.

Regarding the preliminary hearing, I discussed the preliminary hearing and my client's right to have a preliminary hearing, and he will waive that hearing.

Regarding the detention hearing, we -- my understanding is the government is seeking detention, so we would like to proceed with a hearing by proffer.

THE COURT: All right. Well, let's talk about them one at a time then.

The preliminary hearing, Mr. Shiner, you do have a right to have that hearing. At that hearing, the government would have to show that there's probable cause to believe that the crimes you are charged with were committed and that you have committed those crimes. Your lawyer, though, has told me that you wish to waive your right to that hearing.

Is that correct, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Thank you.

Mr. Ziemba, would you mind pulling the microphone down closer to him just so he doesn't have to get up and strain.

Thank you.

All right, the Court accepts Mr. Shiner's waiver of the preliminary hearing. Based on what the Court has reviewed, including the charging instrument, as well as the statement of probable cause, the Court does find probable cause has been established as to the four counts that are charged against Mr. Shiner.

This brings us to the detention hearing. I understand that the government indicated at the initial appearance that it's seeking detention.

Ms. Owen, is the government continuing to seek detention?

MS. OWEN: Yes, Your Honor.

THE COURT: All right. And how do the parties wish to

proceed here this morning for the detention hearing?

MS. OWEN: I will be proceeding by proffer.

THE COURT: All right. Mr. Ziemba, is that amenable to you as well?

MR. ZIEMBA: Yes, Your Honor. Thank you.

THE COURT: Okay. And let me just ask a couple of preliminary questions.

First, the government, are you seeking detention as to danger, serious risk of flight, or both?

MS. OWEN: Yes, Your Honor. It will be due to danger. I do have one or two pieces to add that relate to flight risk, but I believe that danger is what we have evidence to support.

THE COURT: All right. Thank you.

And I don't believe, based on what I've reviewed, that this matter is a presumption case, but let me just check in with counsel on that.

MS. OWEN: It is not, Your Honor.

THE COURT: Okay. Mr. Ziemba, do you agree?

MR. ZIEMBA: That is correct.

THE COURT: Okay. So before we get started with hearing from the lawyers, I just want to talk to Mr. Shiner very quickly about how this is going to work. I'm sure your lawyer's told you this, but I like to cover it with -- with everyone who is here for a hearing in front of me.

The government has the burden to show either by clear

and convincing evidence that you are a danger to another person or the community and there are no release conditions that will reasonably assure the safety of another person or the community, or by a preponderance of the evidence, meaning it's more likely than not true, that there are no release conditions that will reasonably assure your appearance at future proceedings. So that's the law that the Court will have in mind when it listens to the arguments that are made by counsel.

Because the government has that burden -- you don't have the burden. The government does -- then that means we're going to hear from the government first. And then we're going to hear from what you have to say through your lawyer. And then it'll go back to the government for the last word. They get the last word because, as I said, they have the burden. And so that is how we will proceed here today.

I'll be taking notes on my computer in front of me. So if you see me looking down at my screen, that is what I am doing. I am just taking notes because I can write faster -- or type faster than I can write, and I can actually read a screen as opposed to my own handwriting at times, which is sad, but it's true. So that's how I'm going to be proceeding. Rest assured I'm not looking online or doing something else. I am engaged in listening even if I may not be looking up. So I just like to let people know that.

So with all of that being said, we're happy to hear

everything that the parties have to say.

Ms. Owen, go ahead.

MS. OWEN: Thank you, Your Honor.

I'm just going to start with the flight risk portion first to get that on the record.

It does appear that in the pretrial services report he states that he has been living with his girlfriend for quite some time, approximately 18 months, and that it has been at that address. During the course of his firearm purchases, he has been using another address. So the government just wanted to highlight that he has been providing a fake address during those -- or not a fake address, but an incorrect address during the purchase of those firearms.

I don't think that that is enough to find him a flight risk. There is just an inconsistency there that makes the government a little bit concerned about his ability to appropriately convey to the Court his actual location.

Now I want to talk about danger, which I think is more important.

This investigation comes as a spinoff investigation of five individuals that were arrested back in March that were participating in purchasing and selling machine gun conversion devices to the community. That group of five individuals included two juveniles. During that group's activity, they were able to sell approximately 300 machine gun conversion

devices into the community. We became aware of Mr. Shiner because we realized firearms that were purchased by undercovers or recovered as part of that investigation had been originally purchased by Mr. Shiner. And in looking at the chat history from this other group, in several different chats, which are highlighted in the complaint, we found that Shiner did, in fact, assist this -- this group with buying firearms and providing them to them, and then subsequent to the group's takedown appears to have been continued to engage in the sale of these machine gun conversion devices and firearms directly to consumers in replacement of that group that we had taken down. And that is what we learned from his cell phone upon further review.

The day of the takedown, on that July 2nd date, he had sold a firearm that he had just purchased. He attached a machine gun conversion device to it and sold it to another individual. We also know that he had been selling machine gun conversion devices that he had purchased through Torreblanca, which is one of the five individuals that had been charged, and he had sold those himself. He has conversations back and forth with other individuals about these devices and how he is able to obtain and sell them.

We believe that, based upon the messages that we saw on his phone post-arrest, that he had begun to engage and fill that hole that was left when we arrested those five

individuals.

For those reasons, we think that he is a danger to the community and this activity is an incredibly dangerous activity. And something to note that makes Mr. Shiner a little bit different from that group is that group was able to sell completed firearms with the devices attached. They also sold the devices on their own. But in this case, because Mr. Shiner has been able to purchase firearms, it appears that he is selling the firearm with the machine gun conversion device attached, which is significantly dangerous because you are handing over a firearm that is going to be able to shoot automatically. You don't have to be concerned about whether or not it's going to attach appropriately. Any sort of barrier that has to do with the knowledge of the firearm and how to attach it is gone. He would provide it in its full form. That's very concerning to the government. That's an incredibly dangerous thing to be doing.

And given that he picked up this activity, especially after he learned about the takedown. There is a little bit of a break where it appears he stopped buying, but then he picked right back up and even day of was selling and continuing to engage in this behavior. Because this is a danger, we believe he should be detained.

Thank you.

THE COURT: All right. Thank you.

Mr. Ziemba.

MR. ZIEMBA: Thank you, Your Honor.

The starting point for this Court's consideration is that a person arrested for a noncapital offense shall be admitted to bail. That's *United States vs. Motamedi*, 767 F.2d 1403. That's a Ninth Circuit case from 1985.

The case law further goes on to say only in rare cases, that's rare cases, should release be denied. That's *Sellers vs. United States*. And I have the Supreme Court Citation at 89 Supreme Court 36. That's a 1968 case. Now it's regarding propriety of a release are to be resolved in favor of the defendant. That's *Herzog vs. United States*, 75 Supreme Court 349 (1955).

The facts of the case, the strength of the government's case, is the least important factor in this Court's analysis, and that's in recognition of defendant's presumption of innocence. And here I'm citing *to Bell vs. Wolfish*, 441 U.S. 520, at page 533 (1979).

I would ask and call to the Court's attention the bail report that was submitted, which is Document Number 7. I was not the lawyer of record last time, but I did speak with his previous counsel. My understanding is that the Court and the Honorable Judge Deborah Fine was considering releasing my client but wanted to make sure that -- that there could be remote monitoring and that it would be available. That has

been checked by pretrial services and confirmed that there is an apartment with a verified address that my client could stay at and that remote monitoring can be accomplished at this address.

I would also call to the Court the fact that my client's been a resident since the age of 13 years old, a resident of the State of Arizona. He does not have a passport. He's never left the United States. He has a verified address and an address that is provided in the bail report. And it was, as I indicated, found suitable for location monitoring. He does not possess a passport. Again, has never been out of the country. And he would not obtain one in compliance with this Court's directive.

He is employed. He's assured me that that -- he actually will remain gainfully employed should this Court. Should he be fortunate to be released, he could return to work beginning as early as tomorrow morning. He has a shift, so he will be gainfully employed. And he has a stable residence.

Regarding the government's charge regarding dangerousness, case law is fairly clear that the government needs to point to something else besides the facts of its case. And the logic of that is inescapable. If all they're doing is pointing to the facts of their case and the strength of their case, then the reality is no defendant would be released. It needs to be something else the government needs to point to to

suggest that he's a danger to the community besides the facts of this case. They're merely allegations. And if that's all that we have and we always relied on the allegations to establish dangerousness, defendants would never be released.

I would also point out the pretrial services report does deal with the issue of danger to the community and does conclude that he does present a risk, however, outlines conditions which would minimize that risk.

And that coincides with *Motamedi* and the other case law I cited that the defendant should be released on his own recognizance, that the presumption is that he should be released. And these conditions ensure that the community -- any risk to the community will be minimized.

We're asking that the Court follow the neutral recommendation in the bail report and note that my client has no criminal history, he's never failed to appear for a court date in the past, find that he's not a flight risk, and that any danger to the community can be managed through those conditions and release him on his own recognizance.

Thank you.

THE COURT: All right. Thank you.

Ms. Owen.

MS. OWEN: Thank you, Your Honor.

I think that defense makes a lot of points as to flight. And, as I addressed at the beginning, I think that

there are some concerns about flight, but primarily this is involving danger.

I also want to note that the location that he is -- was approved to return to by pretrial services that they checked the GPS monitoring at is a location in which he would reside with his girlfriend. In the government's complaint, paragraph 39 highlights a conversation that was had the date of arrest involving the girlfriend.

The girlfriend is aware that her boyfriend was selling these machine gun conversion devices on firearms. She's aware of this. This is not something that she stopped.

The reason why this behavior is dangerous, the selling of these machine gun conversion devices, is because over the last several years in Maricopa County, we have seen an increase in violence in which these are used. When someone uses, in this case, a handgun with a machine gun conversion device on it, it makes the firearm fire automatically. It also makes it incredibly difficult to control, which can result in stray bullets injuring other victims and other people within the community that were not actually their targets.

These devices have been used on these firearms to cause a lot of damage in the community. It's incredibly dangerous. And Mr. Shiner is selling these devices to these individuals, which is also dangerous. So although the GPS positioning might be helpful to identify his location, it is

not going to stop his behavior. It is not going to take away the danger.

Additionally, being with his girlfriend is not going to take away that danger. She's fully aware of it. They have conversations about these devices. She even says that she thought he was -- wanted to keep the silver button, which is reference to that machine gun conversion device. She is not telling him not to have them. He has them. They're illegal. He cannot have them. No one can have them. But he is in -- he is crucial in this distribution process, and this is how individuals are able to obtain these items and commit these crimes.

Thank you.

THE COURT: Thank you.

Mr. Ziemba, let me just ask one quick follow-up question. I'm sorry. I didn't have it pulled up in front me, but now I do.

You had argued that your client has no criminal history. According to page 4 of the pretrial services report, he does have, it looks like it may be a misdemeanor offense in municipal court in 2020 for carrying a deadly weapon.

Is that --

MR. ZIEMBA: Yes. I --

THE COURT: Is that --

MR. ZIEMBA: What I should have said more accurately

would reflect that he has no prior felony history and he has no failures to appear, which was really my point. I did talk to my client briefly about that. And while it is a misdemeanor and he did pay a fine for it, it was for failure to have a weapon in its holster. That was the underlying facts of that case.

But the Court is correct. There is a misdemeanor conviction. It would be more accurate to put -- state that he has no felony history and he has no failures to appear for any court dates at all.

THE COURT: Okay. Thank you. I appreciate that. I just wanted to make sure that there wasn't some sort of clarification about that I was unaware of. I appreciate that.

Ms. Owen, out of fairness, is there anything else on that particular issue that you wanted to say?

MS. OWEN: I'm not exactly sure what failure to have it in a holster means. There are oftentimes that individuals will be charged with that particular violation for being underage and having possession of a gun or failing to disclose it, but I don't have anything additional.

THE COURT: Okay. Thank you.

All right. So the Court will take this matter under advisement.

And, Mr. Shiner, what that means is I want to go through everything that's been filed again and reread it, along

with some of the cases and things that have been brought to my attention by your lawyer. I'm very aware of the case law, but I always like to go back. If lawyers point out certain things to me, I always like to go back and do that. I just -- I think that's important.

So I will be doing that, taking into consideration what your lawyer has argued, what the government has argued as well. And if I determine that I'm going to release you, then I'm going to bring you back into the courtroom, and we'll talk about what the conditions are of release. If I'm going to detain you, then a detention order will issue, and your lawyer will go through that with you.

As far as timing, I will be able to make that determination by the end of the morning. I do have a couple other matters, counsel, but I anticipate being able to either bring you back or get the order out to you within the hour, so just to give you a little bit of an idea. I'm not sure if you're needed somewhere else in the courthouse immediately after this hearing.

MS. OWEN: Just to understand, are you asking us to -- to stick around the courthouse and wait for about an hour?

THE COURT: Potentially, yes. In case I order him released, I want to make sure everyone's back and we can talk about that. If I order him detained, then you won't need to come back --

MS. OWEN: Okay.

THE COURT: -- but I want to just check your availability in case we bring you back.

Mr. Ziemba?

MR. ZIEMBA: Judge, I can do that.

And I neglected to add, in the event that you do release my client, his girlfriend and his girlfriend's mother are present. They did bring clothing. He'd like to be released bag and baggage. That, of course, is only if the Court releases him.

THE COURT: Okay. All right. Thank you.

And welcome to both of you here in the courtroom this morning.

All right. So with that, we will stand at recess. We will take the issue of detention under advisement. I -- I will do my best to get it out to you even sooner. I would say that an hour is -- is my most conservative estimate, but I'm -- my goal is to -- is to run through everything and get this out sooner than that, but that's my goal.

MR. ZIEMBA: Should I expect an email then from court staff just letting us know the judge would like us back in the courtroom?

THE COURT: Yes.

MR. ZIEMBA: Okay.

THE COURT: All right. Thank you so much.

We will stand in recess.

(Recess taken at 10:44 a.m.)

---oOo---

**C E R T I F I C A T E**

I, CATHY J. TAYLOR, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 4th day of September, 2024.


/s/Cathy J. Taylor
Cathy J. Taylor

UNITED STATES DISTRICT COURT